IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **JOHN STAPLETON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | )  Civil Action |
| | ) |
| **JAKE BEZZANT,** | )  File No. |
| **NIGEL BROOMHALL.** | ) |
| **MICHAEL DOLAN,** | ) |
| **ENTRUST GROUP,** | ) |
| **INVISIBLE URBAN CHARGING** | ) |
| **LIMITED, (NEW ZEALAND),** | ) |
| **INVISIBLE URBAN CHARGING** | ) |
| **INC. (DELAWARE)** | ) |
| **IUC MARKETING LLC,** | ) |
| **LEIGH MORROW** | ) |
| **EILEEN MURRAY,** | ) |
| **GARY SAITOWITZ, and** | ) |
| **DOE DEFENDANTS I-X** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT FOR
## SECURITIES FRAUD AND RELATED CLAIMS

Plaintiff John Stapleton brings this Complaint against Defendants

Jake Bezzant, Nigel Broomhall, Michael Dolan, Entrust Group, Invisible

Urban Charging Limited (New Zealand), Invisible Urban Charging, Inc.

(Delaware), IUC Marketing LLC (Georgia), Leigh Morrow, Eileen Murray,

Gary Saitowitz, and Doe Defendants I-X, and alleges as follows:

## PART ONE: PLAINTIFF'S SUMMARY OF CLAIMS

1.

Plaintiff John Stapleton was fraudulently induced to make a $50,000 investment purportedly in Defendant Invisible Urban Charging ("Invisible Urban").[1] Mr. Stapleton made the investment without knowing: (a) the investment was solicited on the basis of knowingly and materially false financial information; (b) the proceeds of the investment were never intended to be provided to Invisible Urban but rather to entities owned or controlled by Gary Saitowitz, one of the individuals who solicited the investment for Invisible Urban; (c) the investment would not be tax advantaged; (d) Invisible Urban's investment offering was neither registered nor exempt from registration; and (e) his funds would not be invested pursuant to the promised timetable for investment.

2.

After Mr. Stapleton invested, the wrongful acts continued. Mr. Stapleton continued to inquire about the status of his investment, and ultimately learned that his funds were not provided to Invisible Urban (even though he was told they were). When Defendants were confronted with this fact, money appeared out of the sky, evocative of a Ponzi scheme, and suddenly was received

---

[1] Because of the defendant-caused ambiguity between Invisible Urban Limited and Invisible Urban Inc., and the alter ego allegation regarding those entities, the words "Invisible Urban" should be treated as referring to both, unless plainly by context only one can be the subject of the allegation.

3.

Defendants also withheld information about their agent Gary Saitowitz. As detailed below, from 2005 to 2017, Defendant Saitowitz had at least seven instances of FINRA "disclosures." These culminated in an 18-month suspension for wilfully omitting to state material facts. He is no longer registered as a broker or an investment advisor.

4.

Defendants' actions and inactions give rise to the following causes of action: violation of federal securities laws, breach of contract; money had and received; misrepresentation (intentional and negligent); and violations of the Georgia Securities Act.

5.

From the start of Defendant Saitowitz's solicitations for Invisible Urban, through the machinations of those holding funds (Defendant Entrust) and the actions of the individuals involved, the Defendants have been each other's co-conspirators and are liable for all of their actions and omissions.

6.

Mr. Stapleton seeks actual damages for the value of his investment, actual damages for loss of tax advantage, damages relating to rescission, punitive damages, and attorney's fees and expenses of litigation.

## PART TWO: PARTIES, CO-CONSPIRATORS, JURISDICTION AND VENUE

### Plaintiff

7.

Mr. Stapleton is and was at all times relevant to the allegations of this Complaint, a citizen and resident of the State of Georgia.

### Defendants

8.

There are three groupings of Defendants: the IUC Defendants (which include the IUC Director Defendants), the Entrust Defendants and the Doe Defendants. The IUC Defendants are Jake Bezzant, Invisible Urban Charging Limited, Invisible Urban Charging Inc., IUC Marketing LLC, and Gary Saitowitz. The IUC Director Defendants are Bezzant, Nigel Broomhall, Leigh Morrow, and Eileen Murray. The Entrust Defendants are Michael Dolan and Entrust Group.

### The IUC Defendants

9.

Defendant Saitowitz is a citizen and resident of the State of Georgia, Cobb County. Service of process will be attempted at 562 Hackney Dr SE, Marietta, GA, 30067.

10.

Defendant Bezzant is a resident of the State of Georgia. Service of process will be attempted at the address of 530 East Paces Ferry Road

Atlanta, GA 30305 or 111 Dunning Road, Rd 4, Cambridge, 3496, New
Zealand.

11.

Defendant IUC Marketing is an LLC organized and existing under the
laws of the State of Georgia, Cobb County. Service of process will be
attempted at the registered address of its registered agent (Defendant
Saitowitz), 562 Hackney Dr SE, Marietta, GA, 30067.

12.

Defendant Invisible Urban Limited is a New Zealand entity, with its
corporate office in Atlanta, Georgia and may be served by service on Mr.
Bezzant, at its offices located at 530 East Paces Ferry Road Atlanta, GA
30305 or its "address for service," Nigel Broomhall, 141 Gelling Road,
Ararimu, Auckland, 2583, New Zealand

13.

Defendant Invisible Urban Inc. is a domestic corporation organized and
existing under the laws of the State of Delaware, and may be served by
serving its registered agent, The Corporation Trust Company, Corporation
Trust Center, 1209 Orange Street, Wilmington, DE 19801

14.

On information and belief, based (among other things) on usage of a
common name without objection and admissions of doing business as
Invisible Urban, Invisible Urban Inc. and Invisible Urban Limited are each
other's alter egos.

5

15.

Defendant Eileen Murray is a citizen and resident of New York. Service of process will be attempted at the address of 79 Tweed Blvd, Nyack, New York, 10960

16.

Defendant Nigel Broomhall is a citizen and resident New Zealand. Service of process will be attempted at the address of 141 Gelling Road, Rd 3, Drury, 2583, New Zealand.

17.

Defendant Leigh Morrow is a citizen and resident of New Zealand. Service of process will be attempted at the address of 7 Vermeer Place, West Harbour, Auckland, 0618, New Zealand

## **The Entrust Defendants**

18.

Defendant The Entrust Group is a Tennessee Corporation, with its principal office at 3200 West End Avenue Suite 500, Nashville, Tennessee. Its registered agent is Holland & Knight LLP 511 Union Street Suite 2700 Nashville, Tennessee.

19.

Defendant Michael Dolan is a resident of the State of Tennessee and can be served at his business address of 3200 West End Avenue Suite 500, Nashville, Tennessee.

**Doe Defendants**

20.

The Doe Defendants are individuals or entities, the identity of which is not known to Mr. Stapleton, who, during or after the conduct of discovery, would be appropriate to name and add by substitution.

**Party and Non-Party Conspirators**

21.

At all times herein all Defendants have acted as one another's agents or as co-conspirators and have participated in this conspiracy. Defendants have combined in a common scheme, plan or design to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful but by unlawful means, or to accomplish an unlawful purpose by unlawful means. The acts, misrepresentations, fiduciary breaches, reliance thereon, and damages sustained therefrom complained of have occurred in part, are occurring, and unless redressed, will continue to occur in this District.

22.

By virtue of their participation in some or all of the activities and statements, the following individuals and entities are co-conspirators with the Defendants. Although these co-conspirators are not (unless named or joined) liable to the Mr. Stapleton, the Defendants are liable for their actions and omissions:

     a.  Amare Vita Trustee Limited,

     b.  Denise Briggs,

     c.  Melissa Broomhall,

    d.  Maria Saitowitz a/k/a Vanda Saitowitz a/k/a Vanda Maria

        Teixiera-Saitowitz (and a/k/a other permutations thereof).

    e.  Entities owned or controlled by the Defendants.

23.

One or more of the non-party co-conspirators may be substituted for a Doe Defendant should discovery reveal information calling for such substitution.

## **Personal Jurisdiction**

24.

The Court has jurisdiction over the parties and over the subject matter of this action under O.C.G.A. § 9-10-91 because, as set forth in the allegations of this Complaint, the Defendants, who are co-conspirators, committed a tortious act or omission within this State or transact business within this State. Additionally, Defendants are co-conspirators of each other and act as one another's agents, and accordingly, the actions of any of them in Georgia are sufficient to confer jurisdiction over all of them.

## **Venue**

25.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and some Defendants reside and maintain their principal place of business in this judicial district.

## Subject Matter Jurisdiction

26.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 as the claims arise under the laws of the United States. Specifically, Mr. Stapleton alleges violations of 10b of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

27.

This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

## PART THREE: ALLEGATIONS COMMON TO ALL COUNTS

## Defendants, Through Saitowitz, Induce Mr. Stapleton to Invest in Invisible Urban

28.

According to its press releases, "Invisible Urban Charging was founded in 2019 as a complete 'electric vehicle charging solution as a service' provider, working with major property owners across the globe to drive the electrification of transportation and to make an impact. IUC is an end-to-end EV solution, using their capital to deploy high volumes of EV chargers to customer sites for a flat monthly fee. (https://www.businesswire.com/news/home/20230615464093/en/Invisible-Urban-Charging-JLL-Launch-Global-Partnership-for-EV-Charging), accessed March 27, 2025).

***Defendant Bezzant***

29.

Invisible Urban's "Co-CEO and Co-Founder" is Defendant Jake

Bezzant. (https://www.iucharging.com/people/ accessed March 27, 2025). His

position is confirmed on his LinkedIn profile as "Co Founder/Co CEO IU

Charging." https://www.linkedin.com/in/jakebezzant/ accessed March 27,

2025.

30.

In addition, Defendant Bezzant holds himself as "Fmr. Politician l

Barrister / Solicitor of the High Court of NZ l ESG - with Profit l Technology l

Impact l Entrepreneur l Philanthropy." Id.



31.

Bezzant is also a director of Invisible Urban.

32.

However, he briefly resigned his directorship at Invisible Urban, and left politics, due to allegations made against him by an ex-girlfriend relating to online behaviors.

33.

With respect to his statement that he is a Barrister/Solicitor of the High Court of NZ, neither of the lists of lawyers maintained by the New Zealand Law Society list him as a barrister, solicitor, or any other practitioner: The practicing attorneys' search shows:



The "Registry," which identifies individuals even if they are not in active practice, also shows no listing for Bezzant:



34.

Defendant Bezzant also admitted on his LinkedIn profile that he is located or based in Atlanta, Georgia, United States.

### *Defendant Broomhall*

### 35.

Nigel Broomhall is the other CEO and Co-Founder of Invisible Urban and has admitted that he does business in Atlanta, Georgia:



https://www.linkedin.com/in/nigelbroomhall/. He is also a director of Invisible Urban.

### *Defendant Morrow*

### 36.

Defendant Morrow is an officer (Secretary) of Invisible Urban.

### 37.

Defendant Morrow is a director of Invisible Urban.

### 38.

Defendant Morrow is the author of many or most of the written (email) communications from Invisible Urban to Mr. Stapleton.

*Defendant Murray*

39.

Sometime before June 2023, two individuals or entities with the same address as Defendant Murray – EKMurray LLC and Lynne Marie Dennerlein – came to own 314,948 and 314,992 shares of Invisible Urban. This made them the (then) fourth and fifth largest shareholders of Invisible Urban (and if combined, the fourth largest shareholders).

40.

Murray has special expertise in the rules and regulations regarding the purchase and sale of securities. At or around the same time that Murray (or affiliates) because the combined 4th largest shareholder, she was announced as the Company's "Strategic Advisor." Invisible Urban declared "Eileen is a living legend in the US financial services market, having served as co-CEO of the largest hedge fund in the world, and as a senior member of HSBC. She now leads FINRA as well as being on the Boards of several multinationals."

41.

She became a director, and with that her biography still proclaimed her regulatory experience: "A widely respected executive with more than 40 years in financial services. Serves on the boards of HSBC, Guardian Life, and Broadridge Financial Technologies. Served as Chair of FINRA and co-CEO of Bridgewater Associates, the world's largest hedge fund, after senior roles at Morgan Stanley and Credit Suisse."

***Defendants, Especially Saitowitz, Induce Mr. Stapleton's Investment***

42.

In late 2023, Defendant Gary Saitowitz approached Mr. Stapleton with an investment opportunity in a company Saitowitz referred to as Invisible Urban Charging.

43.

Saitowitz described Invisible Urban as being an entity from New Zealand, with offices in Atlanta, which was in the business of designing and implementing electric vehicle charging stations for major (i.e. not individual) property owners.

44.

Invisible Urban publicizes its Atlanta, Georgia presence in spaces such as LinkedIn. https://www.linkedin.com/company/invisible-urban-charging/posts/?feedView=all (accessed March 27, 2025).

45.

Saitowitz presented Mr. Stapleton with a multipaged "Enterprise Valuation Model" for Invisible Urban presuming to show Invisible Urban's performance from 2021 to 2023, and projections thereafter.

46.

A true and correct copy of the Enterprise Valuation Model is attached as Exhibit A.

47.

Saitowitz was acting for Invisible Urban in soliciting an investment from Stapleton.

48.

Saitowitz was authorized by Invisible Urban to make the statements that he did to Stapleton.

49.

Saitowitz held himself out as an agent of Invisible Urban.

50.

Invisible Urban knew Saitowitz was holding himself out as an agent of Invisible Urban and did nothing to correct the impression that he was an authorized agent.

51.

Indeed, since the events described in this Complaint and through the present, Saitowitz is held out as an agent of Invisible Urban

52.

Saitowitz, through the use of the Enterprise Valuation Model, made representations about the past performance of Invisible Urban.

53.

Saitowitz, through the use of the Enterprise Valuation Model, made representations about the future performance of Invisible Urban.

54.

Nothing in the Enterprise Valuation Model contained or referred to its contents as opinion, or that it was made within any "safe harbor"

55.

Stapleton relied on the Enterprise Valuation Model in making his investment in Invisible Urban.

56.

No one, however, disclosed Defendant Saitowitz's background and Defendant Saitowitz's inability to act in certain capacities with respect to investments.

57.

In 2017, Defendant Saitowitz agreed to discipline regarding:

- Having customers sign blank and incomplete forms;
- Causing a Firm to maintain inaccurate books and records;
- Making unsuitable recommendations;
- Improperly participating in private securities transactions;
- Improper use of email;
- Failure to report liens and a judgment.

58.

As a part of that discipline, Defendant Saitowitz's license was suspended for 18 months, and does not appear to have been reinstated.

59.

Defendant Saitowitz's background was known, or reasonably should have been known, to Entrust and Invisible Urban.

60.

Had Mr. Stapleton known of Defendant Saitowitz's background, Mr. Stapleton would not have pursued the transactions described in this Complaint.

61.

Defendant Bezzant took part in each of the representations above.

62.

Defendant Bezzant cloaked Defendant Saitowitz with authority.

**Defendants Cause the Money to Flow Through Entrust**

63.

Saitowitz also proposed that the investment be structured in a fashion that he assured would be tax-advantaged. Saitowitz represented that he would management investment in such a fashion that funds would be taken from one tax-protected retirement account and placed in another, which would then in turn make the investment in Invisible Urban.

64.

Saitowitz identified the Entrust Defendants as the entity that would receive and then invest Stapleton's funds in Invisible Urban.

65.

Entrust solicited Mr. Stapleton's investment by communicating with him via electronic mail in Georgia, by telephone in Georgia, and sending contract documents to Georgia.

66.

Entrust provides account administration for self-directed IRAs. Entrust describes a self-directed IRA as follows:

**An SDIRA is an Individual Retirement Account (IRA) that empowers you to diversify your portfolio with alternative investments.**
With one, you can invest your retirement funds beyond the stock market. A few popular options include private equity, precious metals, real estate, cryptocurrency, and more.

18

Put simply, if you're looking for a tax efficient way to build a portfolio that's more tailored to your interests and expertise, an SDIRA could be the answer.

https://www.theentrustgroup.com/self-directed-iras

67.

Mr. Stapleton relied on the expertise of Entrust, as explained by Entrust and by Defendant Saitowitz. Mr. Stapleton reposed trust and confidence in Entrust.

68.

Entrust is well aware that fraudsters prey on those who use self-directed IRAs: "Criminals sometimes prey on SDIRA holders; encouraging them to open accounts for the purpose of making fraudulent investments. They often fool investors by telling them that if the investment is accepted by a self-directed IRA custodian, it must be legitimate, which isn't true. Again, make sure to carry thorough due diligence on all investments you choose."

https://www.theentrustgroup.com/self-directed-iras

69.

Entrust touts its role in shepherding private equity investments: "Private equity offers the opportunity to get in on the ground floor of the next big thing. You can use your expertise to invest in people, projects, and causes you to believe in. As an investor, you will hold interest or shares in your chosen investments." https://www.theentrustgroup.com/alternative-investments/private-equity

**Mr. Stapleton Invests in Invisible Urban**

70.

In reliance on these representations and omissions made (or withheld) by the Defendants, in whom he had reposed trust and confidence, On December 21, 2023, Stapleton entered a Subscription Agreement with Invisible Urban for 1,753 shares at $28.51 per share -- $49,978.03.

71.

At the time of the Subscription Agreement, Invisible Urban had not registered any offering of securities with the Securities and Exchange Commission.

72.

At the time of the Subscription Agreement, Invisible Urban had not registered any offering of securities with the State of Georgia.

73.

At the time of the Subscription Agreement, the offering of securities was not the subject of any exemption from registration.

74.

Thereafter, Mr. Stapleton paid $15,525.20, directly to one of the IUC Defendants, without the involvement of Entrust. On information and belief, this payment may have lost favorable tax treatment.

75.

On that same day, Mr. Stapleton opened an account with Entrust, funding it with approximately $36,000. On December 28, 2023, Entrust "confirmed" that it had received Stapleton's transfer request.

76.

In January, Entrust informed Mr. Stapleton that his paperwork had been sent to "compliance," that Entrust was waiting on Mr. Stapleton's current financial company to "transfer your cash," that they were "waiting on e-Signature," and then finally on January 22, 2024, that Entrust had paid for his "subscription for Invisible Urban Charging."

## **The Scheme Comes to Light**

77.

Things were not as they seemed. On March 27, 2024 Invisible Urban informed Stapleton that they had received only $15,000 of his subscribed $49,960.50 investment.

78.

Mr. Stapleton immediately began making inquiries of Saitowitz and others as to the missing funds.

79.

In a typical "confidence" tactic, Saitowitz told Mr. Stapleton that his shares were now worth $70.00 per share. Defendant Bezzant echoed this statement.

80.

Defendants had something to hide – the money never made it to Invisible Urban. Instead, it found its way to the deceptively similarly named IUC Marketing LLC.

81.

On January 1, 2024, Gary Saitowitz organized IUC Marketing LLC.

82.

Thereafter, Saitowitz caused the funds that Mr. Stapleton provided to Entrust to be paid over IUC Marketing. On information and belief, he did so by representing that the companies were either the same or related.

83.

Thus, on June 18, 2024, Entrust revealed that on January 24, 2024, it did not fund $36,000 to Invisible Urban Charging, but, rather, sent $36,000 to IUC Marketing.

84.

Then, out of the blue, On June 26, 2024, Invisible Urban Charging acknowledged a total investment of $51,525.80.

85.

Before this purchase, on June 24, 2024, Saitowitz, forwarding information from Bezzant, told Stapleton "Here is what Jake sent me, the valuation that we did in December was $28.51 per share, currently the shares are valued at $70.00."

86.

The shares were not worth $70.00 per share. Saitowitz and Bezzant knew the shares were not worth $70.00 per share, yet intentionally deceived Mr. Stapleton into believing they were. Mr. Stapleton permitted further funds to be invested based on that representation.

## **Condition Compliance**

87.

Mr. Stapleton has demanded rescission of the transactions complained of, and continues to be prepared to present or cancel shares.

88.

Mr. Stapleton has contacted or attempted to contact each named Defendant and non-party co-conspirator in a good faith effort to resolve the matter.

89.

Indeed, Mr. Stapleton has twice provided written notice to each named defendant and non-party coconspirator. Yet, there has been almost no response. (The only response was from Bezzant, who referred Mr. Stapleton to a lawyer, who never responded.)

90.

All other conditions precedent to this action have either occurred, been excused, or would be futile to attempt to exercise.

# PART FOUR: COUNTS ONE THROUGH NINE

## CAUSES OF ACTION

### Count One

### (Federal Securities Fraud)

91.

All prior allegations of the Complaint are incorporated into this Paragraph.

92.

This cause of action is brought under Section 10(b) and Rule 10b-5 of the Exchange Act of 1934.

93.

Defendants engaged in a scheme to defraud Mr. Stapleton by making materially false and misleading statements and omissions regarding investment opportunities.

94.

The transactions described above are investments, as outlined in the subscription agreement.

95.

Bezzant, acting individually and on behalf of Invisible Urban, knowingly or recklessly made false representations to Mr. Stapleton, including but not limited to the following, among others

1. That Mr. Stapleton would be investing in Invisible Urban, not IU

2. That Invisible Urban had met the financial performance contained in the document distributed to Mr. Stapleton.

3. That the projections provided to Mr. Stapleton were not subject to any disclaimers regarding forward-looking statements.

4. That Mr. Stapleton's investment would be tax-advantaged.

94.

Defendant Saitowitz joined in these false and misleading statements individually and on behalf of Invisible Urban.

95.

The above statements were false and misleading when made, as Defendants had no intention of using Mr. Stapleton's funds for the purposes described. Instead, Saitowitz misappropriated the funds for his personal use.

96.

Mr. Stapleton justifiably relied on the false representations and omissions made by Defendants, which induced Mr. Stapleton to invest through multiple transactions.

97.

Defendants' actions directly and proximately caused Mr. Stapleton's damages, including but not limited to the loss of the entirety of the funds invested.

98.

Defendants acted with scienter, intending to deceive, manipulate, or defraud Mr. Stapleton, as evidenced by their continuous solicitation of funds under false pretenses, failure to execute the promised investments, and personal misappropriation of the funds.

99.

Defendants used instrumentalities of interstate commerce, including email, text messages, and bank wire transfers, to perpetrate the fraudulent scheme, thereby satisfying the jurisdictional requirements of Section 10(b) and Rule 10b-5.

100.

As a direct and proximate result of Defendants' violations of Section 10(b) and Rule 10b-5, Mr. Stapleton has suffered damages plus punitive damages, interest, costs, and attorney's fees.

## Count Two

## (Control Person Liability)

101.

All prior allegations of the Complaint are incorporated into this Paragraph.

102.

This cause of action is brought against the IUC Directors in the alternative to IUC Directors being held directly liable for securities fraud for his direct, materially false representations or under an alter ego theory of liability.

103.

This action is brought under Section 20(a) of the Exchange Act.

104.

At all relevant times, the IUC Directors were control persons of Invisible Urban.

105.

IUC Directors exercised complete domination and control over Invisible Urban, including its operations, decision-making, and the conduct giving rise to Mr. Stapleton's claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

106.

Defendant Bezzant used his position of control over Invisible Urban to direct its activities, including the fraudulent solicitation of investments from Mr. Stapleton and the misappropriation of funds for his personal benefit.

107.

As a controlling person of Invisible Urban, IUC Directors had the power to influence and direct the specific conduct underlying Invisible Urban's violations of Section 10(b) and Rule 10b-5. Bezzant directly participated in and orchestrated the fraudulent scheme as described herein.

108.

The IUC Directors knowingly or recklessly failed to prevent Invisible Urban from engaging in fraudulent conduct or otherwise acted in bad faith by using Invisible Urban as an instrumentality to perpetrate securities fraud against Mr. Stapleton.

109.

By virtue of their control over Invisible Urban, The IUC Directors are jointly and severally liable with and to the same extent as Invisible Urban for its violations of the federal securities laws pursuant to Section 20(a) of the Securities Exchange Act of 1934.

110.

As a direct and proximate result of the fraudulent conduct orchestrated and controlled the he IUC Directors, Mr. Stapleton suffered damages, in funds invested based on Defendants' false representations.

## Count III

## (Violation of Section 12(a)(2) of the Securities Act of 1933)

111.

All prior allegations of the Complaint are incorporated into this Paragraph.

112.

For purposes of this Count, Mr. Stapleton expressly exclude and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Section 12(a)(2)(15 U.S.C. § 771) claims under the Securities Act of 1933, as amended (Securities Act).

113.

The Invisible Urban Defendants were each a seller, offeror, and/or solicitor of sale of Invisible Urban securities under Section 12(a)(2) of the Securities Act and pertinent common law.

114.

Defendants offered, sold, and/or solicited a security, by and through making untrue and/or misleading statements of material fact that, in his exercise of reasonable care, they should have known were false.

115.

Defendants solicited Mr. Stapleton in person, over the telephone, through the mail, and through email.

116.

Defendants actively solicited the sale of Invisible Urban's securities to serve the interests of Invisible Urban, its founder, and themselves.

117.

Neither Mr. Stapleton nor Defendants had access to the type of information normally provided in a prospectus of a SEC registration statement such as Form S-1.

118.

At the time they invested, Mr. Stapleton did not know that the representations made to them by Defendants were untrue and did not know that material facts described above were undisclosed. Mr. Stapleton did not know, or in the exercise of due diligence could not have known of the untruths and omissions committed by Defendants.

**Count Four**

**Violation of Section 12(a)(1) of the Securities Act of 1933**

119.

All prior allegations of the Complaint are incorporated into this Paragraph.

120.

For purposes of this Count, Mr. Stapleton expressly excludes and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability under the Securities Act.

121.

Mr. Stapleton has contacted or attempted to contact each named Defendant and non-party co-conspirator in a good faith effort to resolve the matter.

122.

The Invisible Urban Defendants were each a seller, offeror, and/or solicitor of sale of Invisible Urban securities under Section 12(a)(2) of the Securities Act and pertinent common law.

123.

Defendants offered, sold, and/or solicited a security, by and through making untrue and/or misleading statements of material fact that, in his exercise of reasonable care, they should have known were false.

124.

Defendants offered, sold, and/or solicited a security, within the last one year.

125.

Defendants solicited Mr. Stapleton in person, over the telephone, through the mail, and through email.

126.

Defendants actively solicited the sale of Invisible Urban securities to serve the interests of Invisible, its founder, and themselves.

127.

Mr. Stapleton lacked access to the type of information normally provided in a prospectus of a SEC registration statement such as Form S-1.

128.

At the time they invested, Mr. Stapleton did not know that the representations made to them by Defendants were untrue and did not know that material facts described above were undisclosed.

129.

As pleaded above, Defendants sold Mr. Stapleton Invisible Urban securities.

130.

Mr. Stapleton did not know, or in the exercise of due diligence could not have known of the untruths and omissions committed by Defendants.

## COUNT FIVE: GEORGIA SECURITIES ACT
## FAILURE TO REGISTER NONEXEMPT SECURITIES

131.

All prior allegations of the Complaint are incorporated into this Paragraph.

132.

Under O.C.G.A. 10-5-20: "It is unlawful for a person to offer or sell a security in this state unless: **(1)** The security is a federal covered security; **(2)** The security, transaction, or offer is exempted from registration under Code Sections 10-5-10 through 10-5-12; or **(3)** The security is registered under this chapter."

133.

The securities at issue in this litigation are neither registered nor exempt.

134.

Mr. Stapleton is therefore entitled to "recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney fees determined by the court." O.C.G.A. 10-5-58(b)(1).

135.

Mr. Stapleton is also entitled to the remedies set out in the "Remedial Counts" below, to the full extent authorized by law.

## COUNT SIX: GEORGIA SECURITIES ACT
## FALSE OR MISLEADING STATEMENTS

136.

All prior allegations of the Complaint are incorporated into this Paragraph.

137.

This Count is pleaded directly against Invisible Urban, Entrust, and Saitowitz, as control persons against the individual officers and directors of Invisible Urban, and as conspirators against all Defendants.

138.

Under O.C.G.A. 10-5-50: "It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) To employ a device, scheme, or artifice to defraud; (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

139.

Similarly, under O.C.G.A. 10-5-54: "It is unlawful for a person to make or cause to be made, in a record that is used in an action or proceeding or filed under this chapter, a statement that, at the time and in the light of the circumstances under which it is made, is false or misleading in a material respect, or, in connection with the statement, to omit to state a material fact necessary to make the statement made, in the light of the circumstances under which it was made, not false or misleading."

140.

Under O.C.G.A. 10-5-58(c), "A person is liable to the seller if the person buys a security by means of an untrue statement of a material fact or omission to state a material fact necessary in order to make the statement

made, in light of the circumstances under which it is made, not misleading, the seller not knowing of the untruth or omission, and the purchaser not sustaining the burden of proof that the purchaser did not know, and in the exercise of reasonable care, could not have known of the untruth or omission."

141.

By reason of the above allegations, Defendants have violated the principles and prohibitions of these statutes.

142.

Mr. Stapleton is entitled to actual damages, attorney's fees, and interest.

143.

Mr. Stapleton is also entitled to the remedies set out in the "Remedial Counts" below, to the full extent authorized by law.

## COUNT SEVEN: BREACH OF FIDUCIARY DUTY

144.

All other allegations of this Complaint are incorporated into this Paragraph.

145.

As pleaded above, Mr. Stapleton reposed trust and confidence in those he dealt with directly: Entrust, Saitowitz and Bezzant and the other IUC Director Defendants, all of whom acted in conspiracy with the other Defendants.

146.

Defendants breached fiduciary duties by making false statements to Mr. Stapleton about the use and location of his funds.

147.

Defendants breached fiduciary duties by hiding material information from the Mr. Stapleton.

148.

Defendants breached fiduciary duties by making false statements to Mr. Stapleton about the use and location of his funds.

As a result of these breaches of fiduciary duties, Mr. Stapleton has been damaged in the amount to be proven at trial, but at least in the amount of the investment in Invisible Urban.

149.

Mr. Stapleton is also entitled to the remedies set out in the "Remedial Counts" below, to the full extent authorized by law.

**COUNT EIGHT: BREACH OF OBLIGATIONS**

150.

All other allegations of this Complaint are incorporated into this Paragraph.

151.

Defendants, directly or in conjunction and conspiracy with each other, were obligated to use Mr. Stapleton's money to purchase shares of Invisible

Urban in December 2023 or January 2024, and deliver such shares to Mr. Stapleton.

152.

They did not.

153.

As a result of these breaches of fiduciary duties, Mr. Stapleton has been damaged in the amount to be proven at trial, but at least in the amount of the investment in Invisible Urban.

154.

Mr. Stapleton is also entitled to the remedies set out in the "Remedial Counts" below, to the full extent authorized by law.

**COUNT NINE: FRAUD AND MISREPRESENTATION**

155.

All other allegations of this Complaint are incorporated into this Paragraph.

156.

Defendants misrepresented their own nature, the nature of their relationships with each other, the financial state of Invisible Urban, the use and location of Mr. Stapleton's funds.

157.

Defendants, who were under a duty to provide all material information to Mr. Stapleton, failed to provide such information to Mr. Stapleton.

158.

Mr. Stapleton actually and reasonably relied on these misrepresentations and omissions.

159.

Defendants intended for Mr. Stapleton to rely on these misrepresentations and omissions.

160.

Defendants knew these misrepresentations and omissions were false and misleading.

161.

In the alternative, Defendants were negligent or reckless with respect to these misrepresentations and omissions.

162.

These misrepresentations and omissions were the proximate cause of actual damage to the Mr. Stapleton including the amount of the investment in Invisible Urban.

163.

Mr. Stapleton is also entitled to the remedies set out in the "Remedial Counts" below, to the full extent authorized by law.

## PART FIVE: REMEDIES – COUNTS TEN THROUGH SIXTEEN

## COUNT TEN: COMPENSATORY DAMAGES INCLUDING INTEREST

164.

All other allegations of this Complaint are incorporated into this Paragraph.

165.

On all counts of the Complaint, Mr. Stapleton is entitled to compensatory damages in an amount to be proven at trial.

166.

All compensatory damage in this matter occurred on both on a date and for an amount certain. Accordingly, Mr. Stapleton is entitled to prejudgment interest.

## COUNT ELEVEN: PUNITIVE DAMAGES

167.

All other allegations of this Complaint are incorporated into this Paragraph.

168.

The actions of complained of in this Complaint show an intentional withholding of valuable property which was deceitful, self-serving, and financially damaging.

169.

The actions complained of in this Counterclaim reveal callous indifference to the financial well-being and the property rights of Mr. Stapleton.

170.

Defendants acted with the specific intent and knowledge that their decisions and conduct had a substantial likelihood of causing financial harm to Mr. Stapleton by, among other things, depriving Mr. Stapleton of its valuable property.

171.

As a result of Defendants' willful and wanton conduct, Mr. Stapleton is entitled to punitive damages to punish and penalize Defendants for their wrongful conduct and to deter Defendants from repeating the same wrongful conduct in the future, in an amounts to be determined in the enlightened conscience of impartial jurors.

172.

An award of punitive damages in this action is warranted by the reprehensibility of Defendants' conduct and is consistent with the kind of conduct that would subject Defendants to punishment and the severity of the penalty that might be imposed.

**COUNT TWELVE: ATTORNEY'S FEES**

173.

All other allegations of this Complaint are incorporated into this Paragraph

174.

On all Counts, Defendants have been stubbornly litigious, have caused Mr. Stapleton unnecessary time, trouble and expense and have acted in bad faith in connection with the subject matter of this action, therefore entitling

Mr. Stapleton to recover its expenses of litigation, including reasonable attorneys' fees under O.C.G.A. §13-6-11.

175.

Counts One through Four provide a right to attorney's fees to a successful plaintiff.

176.

Counts Five and Six provide a right to attorney's fees to a successful plaintiff.

## COUNT THIRTEEN: ACCOUNTING

177.

All other allegations of this Complaint are incorporated into this Paragraph.

178.

Mr. Stapleton is entitled to a full accounting of all funds received from Mr. Stapleton and then held or distributed to any Defendant.

## COUNT FOURTEEN: CONSTRUCTIVE TRUST

179.

All other allegations of this Complaint are incorporated into this Paragraph.

180.

Based on the foregoing allegations, Defendants possess property (including funds to be accounted for) wrongfully withheld from Mr. Stapleton.

181.

Defendants cannot enjoy the benefit of such property without violating established principles of equity with respect to Mr. Stapleton.

182.

Defendants therefore hold, and have held, such property in constructive trust for Mr. Stapleton.

183.

Mr. Stapleton is entitled to the imposition of a constructive trust couple with an order to pay over all such amounts as called for by the evidence and in the accounting.

## COUNT FIFTEEN: CONSPIRACY

184.

All other allegations of this Complaint are incorporated into this Paragraph.

185.

The Defendants have combined in a common scheme, plan or design to accomplish by concert an unlawful purpose, to accomplish a purpose not in itself unlawful by unlawful means, or to accomplish an unlawful purpose by unlawful means.

186.

Based on the facts alleged in this Complaint, including the character of the acts taken by Defendants, the relation between and among Defendants (and others) and other facts and circumstances suggestive of concerted action between and among Defendants (and others), Defendants (and others) are conspirators with each other and against the Mr. Stapleton.

187.

The conspiracy between Defendants (and others) aggravates the wrongs complained of by Mr. Stapleton in this action and entitles Mr. Stapleton to recover against each of the Defendants for the actions of any Defendants (or others).

## COUNT SIXTEEN: VICARIOUS LIABILITY

188.

All other allegations of this Complaint are incorporated into this Paragraph.

189.

Some of the individual Defendants are employees, officers, directors or other agents of entity Defendants.

190.

In each such instance, vicarious liability attaches.

## PART SIX: PRAYER FOR RELIEF

WHEREFORE, Mr. Stapleton asks this Court to find as follows:

    A. Damages in an amount to be proven at trial under, and depending upon any election of remedies;

    B. Imposition of prejudgment interest;

    C. Equitable remedies of accounting and constructive trust.

    D. Punitive damages;

    E. Attorney's fees and expenses of litigation;

F. Finding that Defendants are conspirators with each other and are therefore liable for each others actions and omissions;

G. Finding, where called for, of joint and several liability.

H. Finding, where called for, of vicarious liability.

I. All other relief that the Court deems just, equitable and proper.

Dated:      April 8, 2025
            Atlanta, GA

*This Complaint complies with the font, margin,
and spacing requirements of Local Rule 5.1.*

Respectfully submitted,

_____
Eric C. Lang
Georgia Bar No. 435515
*Attorney for Mr. Stapleton*

Lang Legal
2566 Shallowford Road
Suite 104, No. 230
Atlanta, Georgia 30345
(404) 384-2591
elang@langlegal.com

# EXHIBIT A

Invisible Urban



*Enterprise Valuation Model*

Aug 2021

# Select Publicly Traded Comparables

**Public Comparable Analysis**

*($ in mm, except share prices)*

| Company | Share Price As Of 8/25/21 | 52-Wk Low | 52-Wk High | Equity Value | Ent. Value | Rev 2021E | Rev 2022E | Rev 2023E | Rev 2024E | Rev 2025E | EBITDA 2021E | EBITDA 2022E | EBITDA 2023E | EBITDA 2024E | EBITDA 2025E | Revenue CAGR '21E-'25E | EBITDA Margin '25E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Charging Infrastructure** | | | | | | | | | | | | | | | | | |
| ChargePoint Holdings, Inc. | $22.24 | $19.04 | $36.86 | $7,150 | $6,566 | 31.8x | 18.9x | 11.4x | 7.4x | 5.2x | | | | 118.0x | 74.7x | 43.7% | 6.9% |
| Blink Charging Co. | 31.93 | 5.77 | 64.50 | 1,346 | 1,153 | 71.0x | 40.5x | 20.5x | 11.4x | 7.7x | | | | | | 56.0% | |
| Beam Global | 27.94 | 10.53 | 75.90 | 250 | 227 | 21.5x | 10.3x | 5.6x | 3.7x | 2.9x | | | | 51.5x | 22.9x | 49.4% | 12.6% |
| EVgo, Inc. | 9.02 | 8.12 | 16.24 | 2,386 | 2,445 | 116.6x | 42.5x | 14.6x | 7.3x | 4.0x | | | | 40.1x | 13.5x | 96.3% | 29.7% |
| Median | | | | | | 51.4x | 29.7x | 13.0x | 7.3x | 4.6x | | | | 51.5x | 22.9x | 52.7% | 12.6% |
| | | | | | | | | | | | | | | | | | |
| **Battery Technology** | | | | | | | | | | | | | | | | | |
| QuantumScape Corporation | $21.25 | $19.12 | $132.73 | $8,811 | $7,308 | | | | 720.0x | 209.7x | | | | | | | |
| Romeo Power, Inc. | 5.04 | 4.09 | 32.73 | 676 | 417 | 22.7x | 3.8x | 1.5x | 0.9x | 0.7x | | | | | | 102.6% | 1.4% |
| FREYR Battery | 9.01 | 7.71 | 13.80 | 1,049 | 1,053 | | 184.7x | 5.7x | 1.1x | 0.5x | | | 17.2x | 10.8x | 2.7x | | 16.8% |
| Microvast Holdings, Inc. | 9.08 | 7.83 | 15.91 | 2,729 | 3,037 | 13.2x | 6.6x | 3.5x | 2.0x | 1.3x | 253.1x | 42.8x | 17.2x | 9.8x | 6.5x | 59.1% | 19.8% |
| Median | | | | | | 17.9x | 6.6x | 3.5x | 1.6x | 1.0x | 253.1x | 42.8x | 17.2x | 10.3x | 6.5x | 80.9% | 16.8% |

2

# Enterprise Valuation: Benchmarking Overview



## EV / Revenue

| | Invisible Urban | Chargepoint | Charging Infrastructure: 2025E Multiple | | | Battery Technology: 2025E Multiple | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | chargepoint | blink | BEAM | EVgo | QuantumScape | ROMEO | FREYR | microvast |
| 2024E | 11.3x | 7.4x | 7.7x | 2.9x | 4.0x | NM | 0.7x | 0.5x | 1.3x |
| 2025E | 7.1x | 5.2x | | | | | | | |
| Rev. ($mm): | $221 | $354 | $893 | $1,266 | $150 | $78 | $611 | $35 | $627 | $2,279 | $2,348 |

## EV / EBITDA

| | Invisible Urban | Chargepoint | Charging Infrastructure: 2025E Multiple | | | Battery Technology: 2025E Multiple | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | chargepoint | blink | BEAM | EVgo | QuantumScape | ROMEO | FREYR | microvast |
| 2024E | 12.2x | 118.0x | | | | | | | |
| 2025E | 7.6x | 74.7x | NM | 22.9x | 13.5x | NM | 46.3x | 2.7x | 6.5x |
| EBITDA ($mm): | $205 | $328 | $56 | $88 | ($11) | $10 | $182 | ($182) | $9 | $384 | $465 |

*Note: Assumes $2.5 billion valuation for Invisible Urban.*

3

# Discounted Cash Flow Model: Key Assumptions

## Comparables Beta

| | Levered Beta | Unlevered Beta |
|---|---|---|
| ChargePoint Holdings, Inc. | (0.27) | (0.27) |
| Blink Charging Co. | 0.94 | 0.94 |
| Beam Global | 2.93 | 2.92 |
| EVgo, Inc. | 0.87 | 0.81 |
| QuantumScape Corporation | (0.16) | (0.16) |
| Romeo Power, Inc. | 1.97 | 1.95 |
| FREYR Battery | 7.75 | 7.67 |
| Microvast Holdings, Inc. | 27.35 | 25.85 |
| Median | 1.46 | 1.45 |

*Levered beta = unlevered beta*
*\*[1+(1-tax rate)\*debt/equity]*

## DCF Assumptions Overview

| | |
|---|---|
| Debt to Capital | 14.0% |
| Cost of Debt (1) | 8.0% |
| Tax Rate | 25.0% |
| Debt to Equity | 16.3% |

| | |
|---|---|
| Risk Free rate (2) | 1.88% |
| Unlevered Beta (3) | 1.45 |
| Levered Beta | 1.62 |
| Market Risk Premium (4) | 5.50% |

| | |
|---|---|
| Size Premium (5) | 1.50% |
| Cost of Equity (CAPM) | 12.3% |
| **WACC** | **11.4%** |

1. *Estimated cost of debt for IU. If the cost of debt drops to 5%, the WACC will drop to 11.1%*
2. *Based on 20-year Treasury Yield per U.S. Department of Treasury.*
3. *Based on trading comparables.*
4. *Per Duff & Phelps guidance Q1 2021.*
5. *Duff & Phelps Valuation Handbook size premium; 6th Decile.*

4

# IUCharging Enterprise Valuation Results:

## Discount Cash Flow Analysis: An Industry Norm

### DCF Forecast

($ in millions)

| | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| Lease Fees | $23.2 | $101.2 | $205.4 | $330.3 | $457.2 |
| Utilisation Fees | $3.5 | $8.9 | $15.7 | $23.3 | $30.9 |
| **Total Revenue** | **$26.7** | **$110.1** | **$221.1** | **$353.6** | **$488.1** |
| *% Growth* | | *312.7%* | *100.9%* | *59.9%* | *38.0%* |
| Rent & Fitout Expense | $0.5 | $0.7 | $1.3 | $2.1 | $2.9 |
| Payroll | $3.4 | $6.1 | $10.1 | $14.8 | $19.6 |
| Marketing | $0.3 | $0.8 | $2.0 | $5.0 | $10.0 |
| Other General & Administrative | $1.2 | $1.5 | $2.4 | $3.5 | $4.6 |
| Total Expenses | $5.3 | $9.1 | $15.8 | $25.4 | $37.0 |
| **EBITDA** | **$21.3** | **$101.0** | **$205.3** | **$328.2** | **$451.1** |
| *% Margin* | *79.9%* | *91.7%* | *92.9%* | *92.8%* | *92.4%* |
| Less: Depreciation | ($9.1) | ($45.4) | ($95.1) | ($155.0) | ($217.0) |
| **EBIT** | **$12.3** | **$55.5** | **$110.3** | **$173.2** | **$234.1** |
| Less: Tax Expense | ($3.1) | ($13.9) | ($27.6) | ($43.3) | ($58.5) |
| **Unlevered Net Income** | **$9.2** | **$41.6** | **$82.7** | **$129.9** | **$175.6** |
| Plus: Depreciation | $9.1 | $45.4 | $95.1 | $155.0 | $217.0 |
| Less: Capital Expenditures | ($6.0) | ($35.9) | ($35.9) | ($104.5) | ($110.7) |
| **Unlevered Free Cash Flow** | **$12.2** | **$51.2** | **$141.8** | **$180.5** | **$281.9** |

## Sensitivity Analysis

### Enterprise Value Sensitivities

| | | Terminal Growth | | | |
|---|---|---|---|---|---|
| | | 2.0% | 3.0% | 4.0% | 5.0% |
| Discount Rate | 9.5% | $3,072 | $3,436 | $3,932 | $4,648 |
| | 10.5% | $2,676 | $2,942 | $3,289 | $3,762 |
| | 11.5% | $2,365 | $2,565 | $2,818 | $3,149 |
| | 12.5% | $2,114 | $2,268 | $2,459 | $2,700 |
| | 13.5% | $1,907 | $2,029 | $2,176 | $2,358 |

### EV / 2023E Revenue

| | | Terminal Growth | | | |
|---|---|---|---|---|---|
| | | 2.0% | 3.0% | 4.0% | 5.0% |
| Discount Rate | 9.5% | 27.9x | 31.2x | 35.7x | 42.2x |
| | 10.5% | 24.3x | 26.7x | 29.9x | 34.2x |
| | 11.5% | 21.5x | 23.3x | 25.6x | 28.6x |
| | 12.5% | 19.2x | 20.6x | 22.3x | 24.5x |
| | 13.5% | 17.3x | 18.4x | 19.8x | 21.4x |

### EV / 2023E EBITDA

| | | Terminal Growth | | | |
|---|---|---|---|---|---|
| | | 2.0% | 3.0% | 4.0% | 5.0% |
| Discount Rate | 9.5% | 30.4x | 34.0x | 38.9x | 46.0x |
| | 10.5% | 26.5x | 29.1x | 32.6x | 37.3x |
| | 11.5% | 23.4x | 25.4x | 27.9x | 31.2x |
| | 12.5% | 20.9x | 22.5x | 24.4x | 26.7x |
| | 13.5% | 18.9x | 20.1x | 21.6x | 23.4x |

*If the Tax rate drops from 25% to 15%, EV goes from $2.5bn to $2.8bn under 11.5% Discount Rate & 3% Terminal Growth.*



Expected Revenue Growth Faster Than Most Competitors

Revenue Growth by Customer

Legend:
- 2026 Sales
- 2025 Sales
- 2024 Sales
- 2023 Sales
- NEWARK
- Atlanta
- Denver
- Cortland
- Marta
- Regents
- LA Metro
- Portman
- Pinnacle
- Lincoln

107% Forecast 4-Year CAGR

92% for Existing Clients CAGR

$488 — 2026
$354 — 2025
$221 — 2024
$110 — 2023
$27 — 2022

$600
$500
$400
$300
$200
$100
-

*Note: 2022 revenue includes Sept – Dec 2021 performance.*

9

# Key Investment Opportunities

A. Blue-chip, creditworthy customer base with credit ratings ranging from BBB to AAA

B. Attractive relative return profile versus current tight credit spread of BBB bonds

C. Long dated 5+5 / 10+10 year contracts provide significant revenue visibility

D. Capital-light business model supports recurring free cash flow generation

E. Rapidly growing market for EV charging driven by inflecting electrification of vehicles globally

F. Experienced management team with proven execution ability